I'm going to go on to the last case, Crouch v. SunCakes, and Mr. Fong, whenever you're ready, we'll hear from you. Well, I thought we'd gone on pretty long on the other case, and maybe it was time to adjourn, but we do have your case, so we'll hear it fully. Your Honors, may it please the Court, my name is Wilson Fong. I represent Ms. Juanita Crouch, the plaintiff appellant in this case. In an employment discrimination case, the plaintiff's testimony is enough to support their claims on summary judgment. The burden then shifts to the defendant to produce evidence of legitimate non-discriminatory reason. It's in the role of the jury to decide who to believe. What happens when the defendant fails to produce any evidence? The plaintiff should be entitled to an adverse inference, and summary judgment should be denied. Wouldn't that be your, then you have as a burden in this case, then you have a burden to do depositions, seek affidavits? The defendant has, or the plaintiff has the initial burden to, however, so that question has a couple questions inside of it. First question is, is plaintiff's testimony enough? When this Court has said that, yes, plaintiff's testimony is enough to survive summary judgment in Williams v. Giant Foods, when that testimony is testimony about facts rather than opinions. Now, what Ms. Crouch testified to, he told me, can we go back to my house and fuck? That's a fact, right? That's not an opinion that she's coming up with. That's a fact. That's the thing that was said to her that gives rise to a sexual harassment claim. The second question about whether we have obligation to do depositions at all. In the first place, my client is ISD. She can't afford depositions. We did take advantage of the discovery tools available to us through the rules of civil procedure. We asked interrogatories. We requested records. Defendant's answer to our question of who terminated Ms. Crouch was, I don't know. They gave a guess. That was the operating guess, I suppose, for the duration of discovery. And then a month after the end of discovery and two days before they filed summary judgment, they changed their guess. They did add a little bit to that, I believe, and you can correct me if I'm wrong, but I think they said that the only person with the authority was the store manager and that the store manager was so-and-so and that the store manager was at work on the date that the plaintiff was fired. They put that information in, didn't they? They added that information in that final discovery response two days before filing summary judgment, but there's some issues with that. The first is that nowhere in their policy does it say that a supervisor can't terminate somebody. They said so. They said the supervisor, he may be able to discipline, but they say hire and fire, only the manager could do that. They said that, and there's nothing to contradict that. And they identified the manager at that time, and they also pointed out that the manager was clocked in for work on the day she was fired. The records that they produce about what their policy is, which level of supervisor-manager can do what, don't actually speak to any of that. The issue of the supervisor being actually clocked in on that day, there's two issues with that. The first is that the records that they produce of their time and the schedule don't really seem to line up. They don't just line up in a way that shows that my client was absent excessively. They also line up in a way that shows that my client was at work when she wasn't scheduled to be at work quite a lot, and there's not really any explanation for that. Well, they did show that beginning in January, your client was scheduled for eight different shifts and appeared at none, and that oftentimes she came throughout her whole employment, including the fall. She came in late or didn't show up, and they claim they assert that based on her attendance practices, she was fired. And so now the question is whether that's a pretext. The burden then comes back to you to demonstrate that was wrong, right? Your Honor, we haven't gotten there yet. Well, my question is am I right on that? No, Your Honor, not quite yet. So to begin with, they . . . Well, it depends on which claim you're talking about. You're talking about retaliation, you're talking about Title VII retaliation, or we're talking about sexual harassment. I mean it's the hostile work environment or whatever, and I think to answer Judge Niemeyer's question, you really need to identify which of the claims you're talking about. There's a different type of proof and different stance for each one. I mean you've got six of them here. Frankly, I think the only one, frankly, the one I'd like to hear about is the hostile work environment. I think you have a hard road of hope on the others. That's just my opinion. It may not be anybody else's, but I'm just saying if you're going in the direction you're going now in terms of retaliation of claims, that's a more difficult road, I think. But you can convince me otherwise. I'll leave that open, but if I was in the position, I'd spend my time on the hostile work environment, but I'm not you. Right, and so that's sort of why I'm saying we're not there yet. So the burden shifting, obviously, we make our prima facie case. They out-profit their legitimate non-discriminatory reason, and then we're at the pretext stage. The problem is there's no contemporary evidence of their legitimate non-discriminatory reason. You're taking their schedule and their clock report at face value when there's this weird discrepancy where she's coming to work and working full shifts on days she's not on the schedule. That can tell us a couple of things. What about the text messages? What about the text messages? Which text messages? There's a ton of them where she's late for work, she didn't come to work, she's for whatever reasons, and there are these text messages back and forth, interestingly, between her and the guy that she said made the inappropriate comments to her, the general manager. So one thing I want to make sure you know. Because you're saying there's something weird about that she's working when she's not. You're questioning, I guess, the time sheets. But those text messages clearly show that she's missing work and late for work and asking, have you fired me yet, because I didn't come to work. Right, and that's the next part of that, which is that contemporaneously, it doesn't seem to have mattered all that much to the defendant at the time. Right, the issue is? Oh, no, in one of the text messages he says there's a corrective action that you have to sign. Right. And if you miss, and then there's another text message that says you have, that this is your last step or something like this, the next step is termination. So they're not saying, oh, just don't come to work. And the text messages that they're sending is like, where are you? You were supposed to be at work at 4 o'clock, and you can see on the text messages it's like 4 or 5, and she's like, oh, yeah, I'm on the way, I overslept. So I'm not sure you're trying to say that there's some discrepancy with the time sheets, but those text messages seem to corroborate that she has some issues with being absent and also being late for work. Yeah, I'm not denying that she had some issues with absenteeism. The question is, was that the actual reason that she was terminated, right? There was a corrective action. There was one, and on that corrective action it indicates a three-step process. There's no step two or three. So contemporaneous evidence doesn't show that that was the reason that she was fired. The first time she was fired for absenteeism appears is it appears years later in response to the EEOC. She wasn't told why she was terminated when she was terminated. There's nobody in the record who says, yeah, I terminated her, and this is why. And that's the important thing is we asked who terminated her, because the point of all of these claims, the point of any discrimination claim is intent, right? In order to know the intent of the decision-maker, you have to know who the decision-maker is. If we don't know who the decision-maker is, we can't know who the intent is. And at that point, they fail to meet their admittedly very low burden of providing some evidence to support their legitimate non-discriminatory reason because we don't know who did it. We don't know why they did it. On the other hand, we have my client who was subjected to this sexual harassment who testified to it specifically. They have no testimony back to the hostile work environment. She testified to what happened to her. The district court seemed to agree that that was sexual harassment, but they disbelieved her because her testimony was self-serving. Even the Eastern District of Virginia case that the court below relied on acknowledges that this stuff is mostly going to happen away from other people. It's going to be a he said, she said kind of situation. We have what she said. We don't have what he said. There's not even an affidavit from Sean Edwards, the man who sexually harassed her, saying I didn't do that. Well, and the problem is because you have the burden and you haven't sought any affidavits or didn't do any depositions. So, I mean, in trying to prove a prima facie case, what are we supposed to do with that if you don't, I mean, understand your issue with her not financially being able to do, but she has to prosecute the case. And she, it simply seems like to me, at least, that she has not done that. I mean, even seeking affidavits to support what she's saying. Who is she going to seek an affidavit from? Can't seek an affidavit from. Well, that's why you have to do depositions. I mean, I understand. Which we can't afford. But you've got to prosecute the case. I have. I asked the discovery question. Did you take the deposition of the manager, store manager? No, Your Honor. Couldn't afford to. In addition to not being. The fact that your client couldn't afford to do some discovery doesn't relieve you of the burdens in the litigation if you're going to pursue the litigation. Well, two responses to that. In the first place, holding the plaintiff to, who cannot afford it, to a responsibility to engage in all forms of discovery that she cannot afford is flatly unfair. But we did follow, we did engage with the discovery tools that are available to us through the rules of procedure. The response we got was, I don't know, from the defendant. So let's take that down. Let's say we did have the money to depose. We would have deposed their first answer, who is this James fellow that we don't know who he is. We go through all the trouble of deposing him, and we find out that he doesn't know anything. Then what? Then my client, who can barely feed herself, has now spent $1,000 deposing somebody who doesn't know anything because defendant couldn't be bothered to ask its own employees what happened. And that's the core of why I cite to Alexander, the Supreme Court's decision in Alexander, is that who terminated the plaintiff and why, is information that is uniquely within the defendant's control, because they're the one who took the action, that they should easily be able to provide when asked, and they didn't. And that should entitle us to an adverse inference because, again, this is something that is uniquely within their control that they should be able to give to us, that they should want to give to us, assuming that it is in their favor, but they didn't. And that's the underlying basis for that line of cases, for the rationale there, is this is something they should want in the record. They should want their evidence that Sean Edwards didn't do this, that somebody else did it, in the record. But it's not. They didn't produce it. We asked for it, and they didn't produce it. Quickly, before I run out of time here, I want to turn to the FLSA claim. The first thing, the court below decided to raise judicata, barred that claim. I want to quickly note that the defendant did not raise that in their response of pleading, according to Rule 8. And so that should not be an issue. Raised judicata shouldn't bar it. Second, under the dual jobs rule in the FLSA, an employer can't take a tip credit for non-tipped work, which is unrelated to the tipped occupation. To be clear, it doesn't matter whether the employee made minimum wage, including tips. What matters is whether or not the employer can credit those tips towards its minimum wage obligations. If it can't, it has to pay minimum wage for the time spent doing that job, regardless of the tips. There's no binding authority either way on what exactly is related or unrelated duties. And the binding authority does admit that, in other areas, it's going to be a judgment call for the court. But there's at least two other courts that have found that servers and hostesses are separate jobs. That's Boe v. H.J. and O'Neill v. Denn, Ohio, which are both district court cases of different states that are out of the circuit. But they're similar because those were both Denny's services, and Denny's is not so different than IHOP. The duties are not so different, and the differences are not so different. So it's clear here that these were different jobs because my client, in order to do the hostessing work, she had to leave the dining area. She couldn't serve people while she was doing it. And most importantly, during the day, the defendant hired a separate person to do this job who they paid more than minimum wage. So the defendant knew that this was a minimum wage plus job that they could not take a tip credit on. Nevertheless, they made my client spend half, sometimes more than half, of her shift doing this job. And that last fact is also why the three-year statute of limitations applies. So not only did Ms. Crouch repeatedly tell them that they have to pay her minimum wage to do the hostess work, the defendant knew that it was actually a separate job. And a violation is willful and subject to the three-year statute of limitations if the employer knew that they were violating the FLSA. The defendant knew it couldn't take a tip credit, but did so anyway. Court below should be overturned, and summary judgment should be denied. Thank you, Your Honor. All right, thank you. Ms. Jones. Thank you. May it please the court, my name is Lori Jones, and I represent the defendant, Apelli, in this matter. I'd like to start off by discussing the adverse inference cases that opposing counsel brought up because I think that those cases have been misapplied in this context. The plaintiff has argued that because we can't specifically identify who terminated his client, that he's entitled to an adverse inference that she was terminated for discriminatory or retaliatory reasons. He cites two Alexander and to one other case. So Alexander is a redistricting case. It involved a congressional map. The challengers in that case did not come forward with an alternative map showing a better racial balance, which case law in redistricting area says you've got to do this. This is an important thing if we're going to be considering whether a map is correct or not. And the court in that case even stated that any expert, and this is a direct quote, can churn out a map. So it was something that could easily be produced, and it was easily obtainable. That is very different from this case when what they're asking us for is after the fact for us to give them an answer to a question that we don't have. And I think that it's important to understand the timeline here. Ms. Crouch, the plaintiff, filed her EEOC claim 531-22. At that point in time, Audra Causey, the general manager that you see, her name in all the briefs, and Sean Edwards were no longer employed by my client. So there was no one. We could not go to them to specifically say, what did you do here? Who made the specific decision? What we do know is that the decision was made and entered into the computer on 1-12-2022. We know that Audra Causey was the only one who had the authority to terminate the plaintiff, and we know that she was there at the store the day that termination was entered. The other case cited by a plaintiff on this adverse inference issue was International Union. And the court there said the rule is that when a party has relevant evidence within its control, which she fails to produce, that failure can give rise to an inference. So there has to be evidence that we are withholding, that we've destroyed, that somehow we're keeping to ourselves before the adverse inference rule comes in. Your Honor, you asked earlier about the hostile work environment claim, and so I wanted to address that as well. Yeah, thank you. I heard all of this and tried to point the counsel to that direction, but I never got to it. And I'll give you at least where I'm coming from so we don't have to go round and round about it. You know there are four elements for this hostile work claim. The court, and you, only focus on the third one, of course, probably rightfully so. You know the three are pretty much there. And that is whether this conduct was severe and pervasive conduct. The question here that's really the focus of this case, and I'm not sure Squarely set up by the Fourth Circuit or where it is, but the question is you have her testimony and you have her deposition. I could go through the litany of things she has in there, but I don't need to do that. We can just assume that it's a lot there. The basis the court relied upon was saying it lacked corroborating evidence. And my question and my concern is typically in cases in which you do have testimonies of individuals who, in this instance, I'll call it a victim, for want of a better way to describe it. She may or may not be one. Gives testimony that could establish the element of hostile work environment. Is there a differentiation between self-serving opinions and testimony that gives personal knowledge of the acts? The Ninth Circuit has held such, and there have been other cases to hold such. I don't think we've directly addressed that question. But it seems to me that an individual who gives testimony that's on personal knowledge of acts, not of whether it was whatever personal opinion, self-serving opinion, which clearly I think you're going to need some corroborating to go with that. Is that a differentiation? And I'd like for you to speak to that, because that's the issue in this case I think that's keen and the one that presents something to decide. Yes, Your Honor. So our position is not that a plaintiff's testimony is always going to be self-serving. It is not that a plaintiff's self-serving affidavit can never be enough to get to summary judgment. In this particular case, we say that it is not. We cited the two cases in. So let me make sure we are on the point with that. So therefore you are saying this affidavit and the deposition may be sufficient if the evidence in it that she says would be sufficient to establish hostile work, then it would be enough to get it to the next step. In other words, you're not saying things beyond the opinions require corroborating evidence. No, Your Honor. I think there's case law that does establish that in a situation like this, especially where there is conflicting testimony, and that's the Nigro case that was cited, and that may be the one that you're referring to. In that Ninth Circuit case, the court said if the plaintiff comes forward with facts, we're going to let that go to a jury. It says if it's based on personal knowledge, legally relevant, internally consistent. I guess that's the part you're dealing with. That's the part that I'm addressing now. So the internally consistent. What does that mean? Internally consistent with what she is saying or internally consistent with what the case? That doesn't sound like that's what they're talking about. It seems like they're talking about what she is saying. Correct. And I think that's exactly what they're saying. And that's a problem in this case because the plaintiff has been basically all over the place with all of the important facts. I'll give you the example of what happened in that two-week period in January before her termination. She first said that she did not show up for those shifts on January 1st because she came down with COVID on January 1st. Then she said she came down with COVID on January 11th. She's also said that she never saw a schedule for those two weeks. But then in another testimony said, well, when she caught wind of the schedule, she had to be off. Help me on that. I'm talking about the hostile work environment, which are these specific things. I'm talking about her establishing in that hostile work. Whether she came to work or not, I understand that. It could be bad all day long. But when she got to work, this is what she said. She said, he's approaching her all the time asking for sex. He wants to take her home to go to sex. He's asking, when are you going to stop playing with me? He goes, that's a whole litany. It goes on about being, the jealous part may be an opinion, but the rest of it goes on, puts her on a speakerphone, talks about this vulgar conversation, propositions for her for sex several times, threats to terminate her. That might be an opinion. I don't know. But I'm dealing with the specific acts of hostile work environment. Then she goes on in the deposition. And then she said, he asked me if he could come back to my place and possibly have sex, I guess. And a number of things about a certain, offered her a ride, and claimed that he's called her a third time about all these things here. I'm not talking about what times she got to work. Okay. The other aspects. I don't think, actually I don't think it's relevant to, maybe, but you tell me, how is that relevant to a hostile working environment based upon someone who is, based on our testimony, consistently harassing this young lady for sex and over and over and wants to take her home and making all these gestures and stuff to her. That's where I'm getting at. Okay. If that's her testimony, and the court says it's not corroborated, but you've agreed, at least I understand, that doesn't have to be corroborated. It can be, but you think it's insufficient to be pervasive and severe. Is that right? Let me restate it and make sure we're on the same page. I believe that in this, I believe there are situations where uncorroborated testimony is enough. This is not one of those situations. And so if we're looking only at the issues arising in the hostile workplace, her story did change over time with that as well. So when we first hear about what her claims are regarding Mr. Edwards, it was that on her first day of work, did she need a ride home, what's she doing after work, and do you want to go back to my place? There's no link then about any sort of demand for sex. That doesn't come until later in deposition testimony. So there is some changing story there. It's not a change. That's just something that she said earlier. But the evidence that she, the only evidence I see they have to support this is her testimony and during the discovery and then the deposition. Those are the two pieces of evidence I'm focusing. What she said outside, I don't, I mean, that's not inconsistent. She just didn't mention it. But here she is mentioning it. Well, and that's where the Freeman and the Holly cases come in. Those are district court cases in the Fourth Circuit. They both cite to Evans a Fourth Circuit case. Both of those cases, for example, Freeman deals with a sexual harassment situation between a supervisor and an employee. So in that case, the employee gave some specific examples, like Ms. Crouch did in this situation, about how there had been staring, there had been some unwanted touching, there had been comments that had been made, and then there was something that happened in New York at a conference or some sort of off-site. And then she did the, excuse me, the employee, who was male, did generally state that I was touched two to three times a day. And so in the Holly court, they noted mere assertions by the plaintiff are not sufficient to survive summary judgment. And one of the reasons there is that this individual testified that there were coworkers who had observed this, there were friends that had observed this. See, that goes back to the corroborating aspect of it. Correct. The court says mere assertions by the plaintiff. I'm not sure we've ever said that. There are cases that deal with, if it's opinions, if you give a self-serving statement on opinions, but she, in that case, was testifying about specific acts that occurred. And those cases are hard to determine anyway. I mean, sexual harassment, who goes around letting everybody see what you do? I mean, if you're dealing with a supervisor and employee situation, they don't do that kind of thing. It's done on a one-on-one, back and forth. And how, I mean, what corroborating? You don't have witnesses that hear these things or maybe evidence that he wrote. Maybe if you can get something they wrote, someone that dumb, then you really got something going on. But most of it is going to be oral-type conversations. That can be true, but in this case we have testimony that she told her friends about these requests for a ride and I want to have sex with you. But that shouldn't defeat it because there are some others who can corroborate what she has. If her statement is sufficient in and of itself, the failure to then further prove it up by corroborating can't defeat evidence. It doesn't make it inadmissible evidence because, again, if her statements are sufficient, then the fact that somebody else knows and you didn't tell that somebody else knows, I mean, that's a weight. I don't know what it is. I think the point, Your Honor, is that her testimony alone is not sufficient in this case. And, again, what the Holly Court said, quoting Evans, was the absence of objective corroboration of any kind of plaintiff's self-serving testimony. But Holly was a district court case, right? It was, Your Honor. Again, but they're quoting Evans here. That's not very helpful in terms of us when we talk to precedent. I mean, maybe it's not even persuasive from my perspective, but I get some courts said that, and I agree. But you can see it, and you will get as much force with that as that district court said. They are quoting a Fourth Circuit case, though, for this proposition. Then tell me about the Fourth Circuit case. If the Fourth Circuit case says it, then you've got it. Well, what the Fourth Circuit says is absence of objective corroboration of any kind of self-serving testimony, a plaintiff's self-serving testimony, makes it unlikely that plaintiff has raised a material issue of fact. And that goes to the instances in which a self-serving testimony is about opinions and matters there. It does not specifically address where there is personal eyewitness knowledge of something. And I don't know, a lot of cases, we don't require that now, eyewitness knowledge. You saw it. We don't need to make, we got you. That's evidence. It's admissible. Then you go to the weight of it and everything else. Evan's court also said, however, Your Honor, that unsubstantiated allegations and bald assertions will not carry the day. I mean, these are unsubstantiated allegations. She is alleging that this employer, this supervisor, did X, Y, and Z. But she's not bringing in any of the other people that she says. I'll turn it loose. But I will say sexual harassment cases are very difficult in these environments here. Because nearly all the things that are going to be said are going to be said in a context where it's going to be just one-on-one. And one can easily say that's unsubstantiated. But I don't think that's what's intended here with the hostile work environment. The other claims in there, I'm intending to see where you go with that. But that one, I think it really comes down to the evidence that she presents, whether it is admissible. And if so, is it sufficient, which is where you've gone on this, and I appreciate that. Thank you, Your Honor. The last thing that I would really touch on is the idea of the second tier of the McDonnell-Douglas burden-shifting test. Because while it does not apply to the sexual harassment hostile workplace claim, it does apply to the other Title VII claims, as well as the retaliation claim under the Fair Labor Standards Act. And our point there is simply that if a prima facie case had been made, which obviously we don't agree, but if a prima facie case had been made, the question then is whether we have produced a legitimate, non-discriminatory reason for the termination. We believe we have. This is a burden of production. It's not a burden of persuasion. We said who could fire her. We said when she was fired. We gave history of her absences. And at that point, if we have offered reasons for our action, which if a jury would believe that, would support a finding that unlawful discrimination was not the cause of termination, it then shifts to the plaintiff. The plaintiff has to come forward with something to say that our reason for termination was pretext. She has not done this here. The most that she's really said is that when she worked at that location a couple years before for a different franchisor, so different employer, that at that location the hostess is clocked in and out. I'm sorry. That goes to the Retaliation Claim for Fair Labor Standards Act. But my point is she's not come forward with anything to say that the reason for that termination was pretext, which is her burden. Your Honors, we believe that the decision of the trial court should be affirmed. Thank you. All right. Yes in rebuttal, Mr. Fong? Yes, sir.  Your Honor, I want to start by citing the Wanamaker Amos, which this court just put out this year. It says that it's not the job of the court to weed out weak cases. It's not the job of the court to substitute its judgment for the role of the jury. That's precisely what Judge Winn was talking about. When plaintiff testifies to facts, the things that have actually happened to her, the defendant can then offer whatever it wants to to say, no, that didn't happen. But the fact that plaintiff testified to specific things that happened to her, those are facts that a jury has to weigh who to believe. Is it different in a sexual environment, a hostile work environment, than in typically other instances because of the nature of the offense? And I'm thinking that in a hostile work environment, the one who is harassing would typically, if very careful about it, would go to extreme means not to do something like this in front of anyone else or to present it. So it makes it a very difficult thing. But, you know, elements include the severity that is very severe and pervasive. And so does it indicate that, you know, it's not a one-off where you just sort of ask one or two times or you just make some suggestive statements. I mean, it makes it difficult. So you need something more than that. You need something, even in her testimony, to indicate that this is continual. And there are instances where it's been continual, and yet maybe no one else heard it but the two of them or maybe it wasn't presented to anyone but her. And that could be even with the touching or anything. There was no touching here that I picked up. She didn't testify to any touching. No, she didn't testify to any touching. Okay. But I think we're in agreement, Your Honor, that she testified that this happened multiple times. He requested for her either to go to her house or to come back to his house and have sex with him. See, that's key is what did she testify? How many times and how much did it happen? That's key is how much is there in her testimony to satisfy that third element. I think in her deposition she said almost every time she worked with him. I also think that the severity, the severity and pervasiveness are the more severe it is, the less often it has to happen. The severity of the phone call, of him playing that phone call for her, I think meets by itself the hostile work environment claim. And I think that you're on to something, that because of what sexual harassment is, and it is something that happens between two people usually out of sight, that the court needs to let a jury hear what happened from the mouth especially of the victim. Well, we don't want everybody who has a complaint against a supervisor to come in and say things directly. That's the thin line. It could be made up. You understand what I'm saying? It could be. And it would create a court case every time someone comes in and present that. So it seems like it needs to be something there, even something more than that. Even though I agree, I tend to believe that personal acts would be something you can testify to. The question in this type of case, what does it mean? In other words, to use a term from one of my colleagues often is, what is the limiting principle to this type of action? Well, Your Honor, I believe it's testimony from personal knowledge. I am of the belief that it is for the jury to decide who is telling the truth and who is not. That's not what the court is supposed to do, especially when it comes to these kinds of situations. It's going to be what you said and she said. I don't think it's an admissibility issue. I think it's a question of whether it provides a sufficient opposition for a question of fact, even though it is admitted. And the logic behind the general principle is that if the evidence is presented in a context, in two different contexts, one in the context where other people witnessed it and saw it or were told about it, they should be brought to corroborate it, or where the deposition says one thing and the affidavit says something else. But we've gone over those principles. I don't think it's a question of whether that applies here. All right. Thank you. I'm sorry that I almost cut out your argument.
judges: Paul V. Niemeyer, James Andrew Wynn, DeAndrea Gist Benjamin